**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KENNETH FITCH, *an individual, on behalf of himself and all others similarly situated,* *

*

*Plaintiff,*

*

v. Civil Action No. RDB-26-01831

*

YAAKOV WEISSMAN, *in his official capacity as the Secretary of the Maryland Department of Budget and Management* *

*

*Defendant.*

*

* * * * * * * * * * * * *

## MEMORANDUM OPINION

This case is about the administration of Maryland's prescription drug benefit programs for Maryland State retirees. On May 8, 2026, Plaintiff Kenneth Fitch ("Mr. Fitch"), a Maryland State retiree, initiated this civil action under 42 U.S.C. § 1983 on behalf of himself and those similarly situated. Plaintiff claims that the Maryland Department of Budget and Management ("DBM") violates constitutional rights by continuing to use a third-party vendor to administer the programs and by requiring eligible retirees to enroll with the third-party vendor to access benefits. *See generally* (ECF No. 1). Plaintiff contends that, contrary to the governing state statute, Section 2-509.1 of the State Personnel and Pensions Article of the Maryland Code ("Section 2-509.1"), DBM has never administered these programs itself. Plaintiff alleges that DBM's failure to administer the program itself is ultra vires and arbitrary, and therefore violates the Equal Protection and Due Process Clauses of the U.S. Constitution as well as Articles 19 and 24 of the Maryland Declaration of Rights. (ECF No. 1 ¶ 6). Plaintiff seeks

declaratory and injunctive relief to remedy the alleged violations. (ECF No. 1, Prayer for Relief).

Presently pending before the Court are Plaintiff's related motions for a preliminary injunction (ECF No. 14) and for a temporary restraining order (ECF No. 20). Plaintiff petitions this Court (1) to enjoin DBM from conditioning access to the programs on enrollment or "opting-in" with a third-party vendor; (2) to enjoin DBM from delegating any statutory responsibilities to a third-party vendor; and (3) to require DBM to perform all statutory functions for the programs established by Section 2-509.1 (d-f). *See* (Proposed Order, ECF No. 14-15); (Proposed Order, ECF No. 20-8). The Court has reviewed the Parties' filings, and on October 28, 2026, held an in-person hearing on the motions. For the reasons set forth on the record at that hearing and elaborated below, Plaintiff's Motion for a Preliminary Injunction (ECF No. 14) and Motion for a Temporary Restraining Order (ECF No. 20)[1] are DENIED.

**BACKGROUND**

This case continues Plaintiff Kenneth Fitch's long-term dispute with the State regarding prescription drug benefits for State retirees. Mr. Fitch is a Medicare-eligible State retiree who is eligible for participation in prescription drug reimbursement programs established by Section 2-509.1 of the State Personnel and Pensions Article of the Maryland

[1] A temporary restraining order provides injunctive relief to a litigant who may suffer irreparable harm before the Court can hold a hearing on a motion for a preliminary injunction. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2951 (3d ed. 2026). Because the Court was able to schedule and hold a hearing without the risk of imminent irreparable harm, Plaintiff's motion for a temporary restraining order is DENIED AS MOOT.

Code. Plaintiff claims that despite his eligibility, he was denied benefits "solely because he did not enroll into Medicare Part D using the third party vendor, 'Via Benefits.'" (ECF No. 14-1 at 2).

Defendant Yaakov Weissmann is the Secretary of Maryland's Department of Budget and Management, which is the State agency responsible for the administration and enforcement of the retiree prescription drug benefit programs. (ECF No. 1 ¶ 19).

To provide context for this dispute, the Court recounts the relevant history of the State's prescription drug benefits for State retirees, the related litigation, and the State's partnership with Via Benefits to administer the programs at issue.

## I. Recent History of Maryland's State Retiree Benefits

### A. Development of Maryland's State Employee and Retiree Health and Welfare Benefits Program (the "State Program")

In 1984, the Maryland General Assembly extended statutory coverage for state employee health benefits to include retiree health benefits. 1984 Md. Laws Ch. 290, p. 1805. The 1984 statute adopted a formula for providing subsidy amounts based on the retiree's years of service. 1984 Md. Laws Ch. 290, p. 1805. However, the legislation did not specify either the amount or level of the state-retiree subsidy or the benefits that would be provided to retirees.

In 1993, the General Assembly formally established the "State Employee and Retiree Health and Welfare Benefits Program" (the "State Program"). 1993 Md. Laws Ch. 10, p. 761. The statute set forth the scope of the State Program and granted broad discretion to the Secretary of Budget and Management to "include the health insurance benefit options established by the Secretary [of Budget and Management]" and "any other benefit option that

the Secretary considers appropriate." 1993 Md. Laws Ch. 10, p. 761-62. The statute did not address the amount of the subsidy or the benefits to which it could be applied.

Then, in 2003, the U.S. Congress enacted the Medicare Modernization Act, which created Medicare Part D ("Part D"), a federal program for retiree prescription-drug benefits. Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003). Part D's design included tiered phases based on the amounts of prescription drug costs incurred by an individual. At a certain phase in the initial design, there was a coverage gap colloquially known as the "doughnut hole" whereby participants would no longer receive any coverage. *See A Detailed Description of CBO's Cost Estimate for the Medicare Prescription Drug Benefit*, at viii (July 2004), available at https://www.cbo.gov/sites/default/files/108th-congress-2003-2004/reports/07-21-medicare.pdf. This was then followed by a "catastrophic" phase, where coverage would resume and cover 95% of prescription drug costs once a participant's out-of-pocket expenses reached a higher level. *Id.*; *see also Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *1 (D. Md. July 19, 2023).

After the enactment of Part D, the 2004 Maryland General Assembly reaffirmed its commitment to providing State retirees the option to purchase state-subsidized prescription drug coverage through the State Program. Md. Code Ann, State Pers. & Pens. § 2-509.1(a)(1) ("the State shall continue to include a prescription drug benefit plan . . . to retirees . . . notwithstanding the enactment of the federal Medicare Prescription Drug, Improvement, and Modernization Act of 2003 or any other federal law"). However, as Congress gradually closed the Part D "doughnut hole" coverage gap under the Affordable Care Act*, see, e.g.,* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132. Stat. 64, the Maryland Generally Assembly

reversed course and enacted legislation requiring state retirees to enroll in Part D coverage in 2019. *Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *1 (D. Md. July 19, 2023) (citing 2011 Md. Laws Ch. 397; 2018 Md. Laws Ch. 10).

**B. *Fitch v. Maryland* Litigation & Related Legislative Changes**

Once state retirees were informed that they would need to enroll in Part D to receive benefits in 2019, Plaintiff in this case, Mr. Kenneth Fitch, filed a lawsuit on behalf of himself and those similarly situated[2] to enjoin the State from imposing this transition. *See generally Fitch v. Maryland*, PJM-18-2817, ECF No. 1-1 (Sep. 11, 2018). In that case, Plaintiffs argued that the State breached a purported contract or duty to the retirees by discontinuing the State Program, and that this also violated due process and equal protection principles. *See generally Fitch v. Maryland*, PJM-18-2817, ECF No. 1-1 (Sep. 11, 2018).

Judge Messitte of this Court initially issued a preliminary injunction preserving the State Program while the litigation was pending, *Fitch v. Maryland*, PJM-18-2817, ECF No. 31 (D. Md. Oct. 16, 2018). However, Judge Messitte later dissolved this preliminary injunction on July 19, 2023, at Defendants' request and after the U.S. Court of Appeals for the Fourth Circuit rejected Plaintiffs' legal theory. *Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *3-4 (D. Md. July 19, 2023) (citing *AFSCME Maryland Council 3 v. Maryland*, 61 F.4th 143, 151 (4th Cir. 2023)). The Court dissolved the preliminary injunction because there was no longer a substantial likelihood that Plaintiffs would prevail on the merits given (1) that all of Plaintiffs' remaining claims derived from the theory that the 2004 General Assembly created a contract

[2] The American Federation of State, County, and Municipal Employees, Council 3 ("AFSCME") later successfully intervened to represent active employees of the State and to apply the preliminary injunction to this group as well. *Fitch v. Maryland*, PJM-18-2817, ECF Nos. 91, 92, 105.

with State employees with respect to the provision of prescription drug benefits, but (2) in *AFSCME Maryland Council 3 v. Maryland*, 61 F.4th 143, 151 (4th Cir. 2023), the Fourth Circuit held with respect to other State employees that no such contract exists under Section 2-509.1. *Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *3-4 (D. Md. July 19, 2023); *see also Fitch v. Maryland*, PJM-18-2817, 2023 WL 6388060, at *1 (D. Md. Sep. 29, 2023) (summarizing history of the litigation), *aff'd*, Nos. 23-2135, 24-2266, 2025 WL 1443938 (4th Cir. May 20, 2025).

In 2019, when the *Fitch v. Maryland* Court's preliminary injunction was initially in place, the General Assembly created three programs to approximate the prescription drug benefits retirees received under the previous State Program. *See* 2019 Md. Laws. Ch. 767 § 2. These replacement programs are codified in Md. Code, State Pers. & Pens. § 2-509.1(d)-(f) (collectively, the "Replacement Programs"), and include the following:

(1) The Maryland State Retiree Prescription Drug Coverage Program ("Drug Coverage Program"). Md. Code, State Pers. & Pens. § 2-509.1(d). This program is available to retirees who "retired on or before December 31, 2019." §2-509.1(d)(1)(ii). Under this program, Medicare-eligible retirees' out-of-pocket costs are capped at the same level as non-Medicare-eligible retirees' out-of-pocket costs, which was consistent with the State's previous policy. §2-509.1 (d)(2).

(2) The Maryland State Retiree Catastrophic Prescription Drug Assistance Program ("Catastrophic Program"). Md. Code, State Pers. & Pens. § 2-509.1(e). This program is available to retirees who entered state service on or before June 30, 2011, and retired on or after January l, 2020. §2-509.1(e)(1)(ii). This program would cover additional out-of-pocket costs once a Medicare-eligible retiree enters the catastrophic phase under Medicare. §2-509.1(e)(2).

(3) The Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program ("Life-Sustaining Program"). Md. Code, State Pers. & Pens. § 2-509.1(f)(2). This program is available to any retiree who participates in the first two programs. § 2-509.1(f)(1)(i). This program reimburses retirees for any out-of-pocket costs for life-sustaining medications that are covered through Maryland's health insurance benefit options but not covered under Medicare.

Md. Code, State Pers. & Pens. § 2-509.1(d)-(f); *see also Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *2 (D. Md. July 19, 2023) (summarizing the Replacement Programs).

Upon the dissolution of the preliminary injunction in *Fitch v. Maryland* in 2023, which permitted the elimination of the State Program and transition to Medicare Part D and the Replacement Programs, the Maryland General Assembly enacted a timeline for the changes to go into effect. 2019 Md. Laws Ch. 767 § 2; *Fitch v. Maryland*, PJM-18-2817, 2023 WL 4669549, at *2 (D. Md. July 19, 2023). Pursuant to this timeline, DBM transitioned retirees to Medicare Part D and the Replacement Programs on January 1, 2025. (ECF No. 14-5)

The *Fitch v. Maryland* Court ultimately granted summary judgment in favor of Defendants on Plaintiffs' claims in light of the Fourth Circuit's decision that Section 2-509.1 did not create a contract with the State and also because the Court found that Plaintiffs would not be prejudiced if moved from the previous State Program to Medicare Part D and the Replacement Programs. *Fitch v. Maryland*, PJM-18-2817, 2023 WL 6388060, at *1-2 (D. Md. Sep. 29, 2023), *aff'd*, Nos. 23-2135, 24-2266, 2025 WL 1443938 (4th Cir. May 20, 2025). In the Court's summary judgment opinion, Judge Messitte cautioned:

> If the State were to implement its 2019 Programs' reimbursement plan in a manner that denied individuals the coverage required by either the 2019 Programs or Medicare Part D, that might well be grounds for a new claim. But until then, the harm Plaintiffs allege is wholly speculative.

*Id.* at *1-2.

### C. Congress Amends Medicare Part D Through Inflation Reduction Act of 2022

After the General Assembly's enactment of the Replacement Programs in § 2-509.1(d)-(f), Congress passed the Inflation Reduction Act ("IRA") in 2022, which expanded coverage under Medicare Part D. Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818. The IRA "caps Part D OOP [(out-of-pocket)] spending at the catastrophic threshold, beginning in 2024, and reduces OOP spending required to reach the catastrophic threshold (set at $7,050 in 2022) to $2,000 in 2025." *Selected Health Provisions of the Inflation Reduction Act*, Congress.Gov, https://www.congress.gov/crs-product/IF12203 . In other words, the IRA has made it so there are no out-of-pocket costs once an enrollee reaches the catastrophic coverage phase.

Therefore, DBM's Director of Employee Benefits, attests that the State has not implemented the Catastrophic Program established in Section 2-509.1 because retirees no longer incur any out-of-pocket costs once they reach the catastrophic phase. (ECF No. 17-1, Ex. 1, Decl. of Christina Kuminski ("Kuminski Decl.") ¶ 4 ("Because a Medicare Part D enrollee would thus incur no out-of-pocket costs during the 'catastrophic' coverage phase, Maryland's Catastrophic Program is superfluous under current law.")).

## II. Implementation of Replacement Programs with Via Benefits Partnership

Section 2-509.1 provides that each of the three Replacement Programs are to provide reimbursement through (1) a health reimbursement account or (2) another program that provides assistance with prescription drug costs." *See* § 2 509.1(d)(3), (e)(3), (f)(3).

To implement the Replacement Programs with the above-referenced reimbursement mechanisms, DBM contracted with vendor Extend Health, LLC, which operates the Via Benefits marketplace. (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 8, 9); *see also* (ECF No. 14-5 (announcing the "State of Maryland contracted with Via Benefits to offer counseling and enrollment assistance" for State retirees)). DBM pays Extend Health, LLC approximately $775,000 annually to administer the Health Reimbursement Accounts and reimbursement mechanisms for the Replacement Programs. (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 16). DBM's contractual relationship with Extend Health, LLC includes provisions regarding "confidentiality and privacy safeguards for protected health information" pursuant to federal and state laws. (*Id.* ¶ 15).

Since the Replacement Programs have gone into effect, DBM has conditioned the availability of the Replacement Programs on enrollment in a Part D plan through the Via Benefits marketplace. (*Id.* ¶ 10). In other words, to take advantage of Replacement Programs, an eligible state retiree must purchase a Part D plan through the Via Benefits marketplace. (ECF No. 17-1 at 9). DBM recently revised this enrollment policy on or around October 13, 2026. The DBM website now contains an "IMPORTANT UPDATE" announcing that retirees will be able to access benefits without enrollment through "Via Benefits," beginning January 1, 2027:

> The State of Maryland is changing their requirement for access to the prescription drug financial assistance programs, including the Health Reimbursement Arrangement (HRA) and the Life-Sustaining Prescription Drug Assistance Program (LSPDP). Effective January 1, 2027, you may enroll in a Medicare Part D prescription drug plan through Via Benefits, directly with an insurance company, through Medicare.gov, or through another licensed Medicare resource and still maintain access to the State's HRA, provided you

> continue to meet all other eligibility requirements. A letter has been mailed to you providing more details.

Department of Budget and Management: Health Benefits, Maryland State Retirees, Maryland.gov, https://perma.cc/59AZ-Y9CT; (ECF No. 22, Ex. 1 DBM Letter dated Oct. 13, 2026). However, a retiree who enrolls in a Part D plan through an avenue other than Via Benefits but who wishes to participate in the Replacement Programs must still "opt in" to the Replacement Programs by contacting Via Benefits and confirming contact information. (ECF No. 22, Ex. 1 DBM Letter dated Oct. 13, 2026).

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). In determining whether to issue a preliminary injunction, this Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that:

> (1) the movant is likely to succeed on the merits;
>
> (2) the movant is likely to suffer irreparable harm absent preliminary relief;
>
> (3) the balance of equities favors the movant; and
>
> (4) an injunction is in the public interest.

555 U.S. at 20; *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

A court cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226

(4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021); *accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The plaintiff "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

## ANALYSIS

Plaintiff has not carried his burden as to the four *Winter* factors to warrant injunctive relief by this Court.

### I. Likelihood of Success

Plaintiff contends that DBM's use of a third-party vendor to administer the Replacement Programs is ultra vires; violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. (ECF No. 14-1 at 5-7). Plaintiff has not demonstrated a likelihood of success as to any of these claims.

#### A. Plaintiff's ultra vires claims are unlikely to succeed.

First, Plaintiff contends that "DBM's administrative actions are ultra vires under Maryland law because they contravene the unambiguous mandatory language of § 2-509.1(d)-(k) and exceed the scope of the authority that the Maryland General Assembly" by (1) requiring enrollment through a third-party vendor to access benefits (ECF No. 14-7 at 8); (2) delegating enrollment, counseling, and notice functions to a third-party vendor (ECF No. 14-7 at 8-9); and by (3) using a health reimbursement arrangement ("HRA") that provides fixed annual

contributions rather than "actual prescription-drug costs." (ECF No. 14-1 at 8). In support of Plaintiff's ultra vires arguments, Plaintiff has cited federal cases determining whether federal agency action is ultra vires under federal statutes. (ECF No. 14-1 at 7-9 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 423 (D. Md. 2025)). However, as Defendant aptly notes, those federal cases examining federal agency action are not useful[3] in this action examining state agency actions. (ECF No. 17-1 at 27 (citing *Lesane v. Bell*, No. 5:24-CV-564-FL, 2024 WL 5056259, at *4 (E.D.N.C. Dec. 10, 2024)); *see also Aqua Tex., Inc. v. Hays Trinity Groundwater Conservation Dist.*, No. DAE-1:23-CV-1576, 2026 WL 2977503, at *6-7 (W.D. Tex. Aug. 24, 2026) (considering Texas courts' interpretations to determine whether state groundwater district exceeded scope of statutory authority when imposing permitting moratorium); *Reliance Tel. of Grand Forks, Inc. v. O'Brien Cnty.*, 2022 U.S. Dist. LEXIS 249001, at *14-15 (N.D. Iowa Jan. 5, 2024) (looking to Iowa courts' interpretations of ultra vires contracts entered into by municipal corporations created by state statutes). Therefore, this Court looks to Maryland courts' interpretations of agency actions and claims that an agency exceeded its authority under its enabling statute.

Under Maryland law, a state agency's quasi-legislative action, such as the adoption of a generally applicable rule, statement of policy, approval of funding, or award of a contract,[4]

---

[3] *See generally* John R. Grimm, Landyn Wm. Rookard, *How Federal and Maryland Courts Review Administrative Agency Actions*, 81 Md. L. Rev. 1224 (2022) (comparing judicial review of federal and Maryland agency actions).

[4] *Lewis v. Gansler*, 204 Md. App. 454, 480 (2012).

may be reviewed by a court to determine if the "regulation"[5] "exceeds the [agency's] statutory authority," *see* Md. Code Ann., State Gov't § 10-125(d)(2), or if the agency "was acting within the scope of its statutory authority." *Lewis v. Gansler*, 204 Md. App. 454, 473 (2012); *see also* John R. Grimm, Landyn Wm. Rookard, *How Federal and Maryland Courts Review Administrative Agency Actions*, 81 Md. L. Rev. 1224, 1243 (2022) (explaining that statutory review pursuant to Md. Code Ann., State Gov't § 10-125 is functionally equivalent to review pursuant to the court's inherent authority to review an agency action). Under this limited review, courts may generally "defer to [Maryland] agencies' decisions . . . because they presumably make rules based upon their expertise in a particular field." *Medstar Health v. Md. Health Care Comm'n,* 376 Md. 1, 20-21 (2003) (quoting *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 453 (1995)). Further, where, as here, "the [Maryland] General Assembly has delegated . . . broad power to an administrative agency to adopt [legislative rules] or regulations [in a particular area], [Maryland's Supreme Court] has upheld the agency's rule or regulations as long as they did not contradict the language or purpose of the statute." *Medstar Health*, 376 Md. at 21 (quoting *Christ v. Department of Natural Resources*, 335 Md. 427, 437 (1994)). With these principles in mind, this Court examines DBM's enabling statute to determine whether DBM has exceeded its authority implementing the Replacement Programs.

---

[5] Under the Maryland Administrative Procedures Act, "regulation" is defined broadly to include "a statement or an amendment or repeal of a statement that (i) has general application; (ii) has future effect; (iii) is adopted by a unit to: 1. detail or carry out a law that the unit administers; 2. govern organization of the unit; 3. govern the procedure of the unit; or 4. govern practice before the unit; and (iv) is in any form, including: 1. a guideline; 2. a rule; 3. a standard; 4. a statement of interpretation; or 5. a statement of policy." Md. Code Ann., State Gov't § 10-101(g)(1).

1. Plaintiff has not demonstrated that DBM has acted ultra vires by imposing vendor enrollment conditions or by delegating program administration to the vendor.

As to Plaintiff's first two contentions that the vendor enrollment requirement and the delegation of administration of the Replacement Programs to the vendor violates Section 2-509.1, Plaintiff is unlikely to succeed. (ECF No. 14-1 at 8-9). As an initial matter, DBM has revised its enrollment policy, which will allow retirees to enroll in Medicare Part D outside of the Via Benefits vendor as of January 1, 2027. *See supra* at 9-10. Therefore, the lack of enrollment options that Plaintiff challenges will be remedied in a matter of months. Moreover, the State Personnel and Pensions Article has granted DBM broad authority to administer the State Program: "The Secretary may arrange as the Secretary considers appropriate any benefit option for inclusion in the Program." Md. Code, State Pers. & Pens. § 2-503(b)(1). Therefore, DBM has been granted broad authority and certain discretion to "arrange" the benefit options.

More specifically, Section 2-509.1, establishing the Replacement Programs, envisions the use of vendors for their administration. Section 2-509(i) grants the Department the authority to "make an emergency procurement for . . . a third-party to administer health reimbursement accounts established under this section." Md. Code, State Pers. & Pens. § 2-509.1(i)(2). As Defendant notes, this vendor procurement provision was added as an amendment to the initial bill specifically to "allow[] [DBM] for staffing . . . or for outsourcing specifically for the health reimbursement account." Floor Debate on S.B. 946, Md. Senate, 439th Leg. Sess. (Mar. 11, 2019) (statement of Sen. Serafini at 01:17:44-01:18:10).[6] It was intended to "allow some flexibility to DBM with procurement so that they could secure

[6] The March 11, 2019, Senate Floor Debate audio is available at the following link: https://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/senate-43-?year=2019RS .

outside assistance in developing their program." Hearing on S.B. 946 Before the H. Appropriations Comm., 439th Leg. Sess. (Mar. 19, 2019) (testimony of Sen. Griffith at 41:59-43:10).[7] Finally, the Executive Director of the Department of Legislative Services testified that the bill was drafted to be "very broad for DBM to undertake [the] implementation" and predicted that the Department "will end up contracting with a company to provide health reimbursement arrangements and actually we estimated in the bill [that cost]." *Id.* (testimony of Vicki Gruber at 41:04-42:07). In sum, it was understood that DBM would likely use a vendor to carry out the Replacement Programs, and Section 2-509.1 reflects this understanding.

Therefore, requiring enrollment through a third-party vendor to access benefits and delegating enrollment, counseling, and notice functions to a third-party vendor does "not contradict the language or purpose of the statute." *Medstar Health*, 376 Md. at 21 (quoting *Christ v. Department of Natural Resources*, 335 Md. 427, 437 (1994)). The General Assembly specifically granted DBM broad authority and flexibility in implementing the programs with the assistance of outside vendors and DBM has done just that. Christina Kuminski, the Director of DBM's Employee Benefits Division, explained that pursuant to Section 2-509(i), DBM contracted with Extend Health, LLC, "as an emergency procurement consistent with state law" following DBM's "internal decision that it did not possess the capabilities to independently run the statutory reimbursement programs without the assistance of an independent third party." (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 9-10). DBM initially conditioned the availability of

---

[7] The March 19, 2019, Appropriations Committee Hearing recording is available at the following link: https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=app&ys=2019RS&clip=APP_3_19_2019_meeting_1&billNumber=sb0946 .

the Replacement Programs on enrollment in a Medicare Part D plan through Extend Health LLC's Via Benefits marketplace "to further its goals of effective and efficient operation of the programs." (*Id.* ¶ 10). DBM maintains a file with the eligibility determinations for each retiree based on their retirement date and regularly shares that eligibility information with Extend Health. (*Id.* ¶ 11).

Given the text and legislative history of Section 2-509.1, Plaintiff has not shown that DBM's partnership with Extend Health or Via Benefits violates any statutory provision or that it violates the purpose of the Replacement Programs. In a Notice of Supplemental Authority (ECF No. 25), Plaintiff directed this Court to Maryland authorities regarding agency authority. These decisions do not counsel a different result. (ECF No. 25 (citing *F. & M. Schaefer Brewing Co. v. Comptroller of the Treasury*, 255 Md. 211 (1969); *Holy Cross Hospital of Silver Spring, Inc. v. Health Services Cost Review Commission*, 283 Md. 677 (1978)[8]; *Baltimore Building & Construction Trades Council v. Barnes*, 290 Md. 9 (1981))).

Plaintiff cites *F. & M. Schaefer Brewing Co. v. Comptroller of the Treasury*, 255 Md. 211 (1969), for the proposition that "an agency may not add an administrative prerequisite to an entitlement or exclusion created by the General Assembly." (ECF No. 25 at 1). Plaintiff contends *F. & M.* supports their argument that DBM's enrollment and opt-in requirements

[8] Plaintiff cites *Holy Cross Hospital of Silver Spring, Inc. v. Health Services Cost Review Commission*, 283 Md. 677 (1978) for the proposition that, "It is elementary that since an administrative agency, such as the Commission, is a creature of statute, it has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute." (ECF No. 25 at 2). However, Plaintiff does not advance arguments that the agency action or the statute were similar to the circumstances here, so the Court focuses its analysis on the two other cases cited in Plaintiff's Notice of Supplemental Authority. (ECF No. 25 at 2). In any event, *Holy Cross Hospital of Silver Spring, Inc.* is distinguishable because the Commission's interpretation of its authority in that case was contrary to its interpretation in prior years which assumed it did not have the authority in question. *Holy Cross Hospital of Silver Spring, Inc.*, 283 Md. at 685-86.

to access benefits are inconsistent with the statute, but *F. & M.'s* statute and agency action are plainly distinguishable from the circumstances here. (ECF No. 25 at 2). In *F. & M.*, the then-Maryland Court of Appeals found that a rule from the Comptroller which required a "resale" certificate to qualify for a statutory exemption from the sales tax for electricity was outside of the Comptroller's statutory authority. *F. & M.*, 255 Md. at 212-14, 219-20. The Comptroller's rule would effectively render electricity sales taxable (if no certificate was obtained) despite the statutory provisions excluding these sales from the tax. *Id.* at 219-20. Further, the statute interpreted in *F. & M.* specifically stated that "No vendor shall accept a resale certificate for property which he knows or should know is not for resale," *id.* at 216-17, so the Comptroller's requirement that an electricity provider obtain a resale certificate even though the electricity provider had no intention of reselling the electricity, was contrary to the statute. *Id.* at 216-17. "The certificate provision was intended to be applicable to sales made for the purpose of resale and to no other sales," so that there was no way that the Comptroller's rule could be "reconciled and harmonized" with the statute. *Id.* at 217.

Unlike in *F. & M.*, there is no statutory provision in the State Personnel and Pensions Article that prohibits DBM from requiring retirees to enroll with or notify a vendor to access benefits under Section 2-509.1.[9] And unlike the "resale certificate" in *F. & M.*, enrollment and opting-in to the benefits are not contradictory to the purpose of the statute, but rather are

[9] Section 2-509.1 provides, however, that any retiree (or eligible dependent) who is initially enrolled in either the Maryland State Retiree Prescription Drug Coverage Program or the Maryland State Retiree Catastrophic Prescription Drug Assistance Program, "shall be automatically enrolled" in the "Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program." Md. Code, State Pers. & Pens. § 2-509.1(f)(4). This provision, however, does not prevent DBM from imposing any initial administrative enrollment requirements for the Maryland State Retiree Prescription Drug Coverage Program or the Maryland State Retiree Catastrophic Prescription Drug Assistance Program.

procedures DBM has found facilitate the administration of benefits. (ECF No. 17-1, Kuminski Decl. ¶¶ 9-10).

Likewise, Plaintiff's citation to *Baltimore Building & Construction Trades Council v. Barnes*, 290 Md. 9 (1981) is inapposite. Plaintiff cites *Baltimore Building & Construction Trades Council* for the proposition that a Court may limit an "administrative interpretation where the agency's construction was not supported by the statutory text and purpose." (ECF No. 25 at 2). In *Baltimore Building & Construction Trades Council*, the then-Maryland Court of Appeals determined that the Commissioner of Labor and Industry improperly issued subpoenas at the request of a labor union council since the labor union council was not an "interested person" within the meaning of the prevailing wage statute. *Baltimore Building & Construction Trades Council*, 290 Md. at 10-11.

However, that case reviewing an agency's adjudicative actions is not analogous to a review of administrative requirements imposed by DBM's partnership with a vendor. *C.f.*, *Baltimore Building & Construction Trades Council*, 290 Md. at 14 (noting for review of agency adjudicative actions, the standard of review entails "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached" (quoting *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 309 (1967))). Further, the Court reasoned that the Commissioner's issuance of the subpoenas in *Baltimore Building & Construction Trades Council* would render terms in the definition of "interested person" as mere "surplusage" and would be contrary to a "more reasonable interpretation" of the investigations section of the statute which the Court found should refer to the immediate payors and payees of the wages. *Baltimore Building & Construction Trades Council*, 290 Md. at 17. Here, Plaintiff has identified no terms that would be rendered

surplusage or contradictory by DBM's enrollment and opt-in conditions. *See* (ECF No. 17-1 at 7-9); *see generally* (ECF No. 25).

Therefore, Plaintiff has failed to demonstrate that he is likely to succeed on his claim that DBM's vendor enrollment and opt-in conditions are ultra vires.

2. <u>Plaintiff has not demonstrated that DBM contravened the statute by providing fixed annual deposits for the health reimbursement accounts.</u>

For each of the Replacement Programs, Section 2-509.1 provides that programs "reimburse[] a participant for out-of-pocket costs" after reaching certain thresholds. Md. Code, State Pers. & Pens. § 2-509.1(d)(2); *id.* § 2-509.1(e)(2); § 2-509.1(f)(2). In provisions concerning DBM's reporting on the programs, Section 2-509.1 requires information regarding the method and timing of reimbursement for eligible "out-of-pocket costs," including "a plan to use debit cards to process reimbursements in a convenient and efficient manner." § 2-509.1(j)(3).

Plaintiff contends that "DBM's decision to substitute fixed annual HRA [health reimbursement account] deposits for reimbursement of actual costs directly contravenes the mandatory reimbursement obligation." (ECF No. 14-1 at 8).[10] In response, DBM provides a detailed explanation, supported by the affidavit of Director Kuminski and DBM's correspondence to retirees,[11] of the deposits and reimbursement calculations, which it

---

[10] On this point, unlike Plaintiff's other ultra vires arguments, Plaintiff categorizes the reimbursement mechanism as only [l]ikely non-compliant" in Exhibit X "Compliance Comparison Chart" (ECF No. 14-8).

[11] The September 9, 2024 introductory correspondence referenced is available at the following link: https://perma.cc/F4TS-5KVU .

contends "[m]eet[] and [e]xceed [s]tatutory [r]equirements." (ECF No. 17-1 at 9-12 (citing Ex. 1, Kuminski Decl, ¶ 3)).

Specifically, DBM contends that the Replacement Programs are designed to reimburse retirees for the difference between the out-of-pocket maximums under the State plan and under Medicare Part D. Therefore, the fixed deposit amounts correspond to these identifiable gaps to cover any out-of-pocket costs the retiree will incur. (ECF No. 17-1 at 9-10). For example, Section 2-509.1 requires DBM to establish a "Maryland State Retiree Prescription Drug Coverage Program that reimburses a participant for out-of-pocket costs that exceed the limits established for non-Medicare-eligible retirees in § 2-508(d)(2)(iii)." *Id.* § 2-509.1(d)(i). Currently the limit in § 2-508(d)(2)(iii) is $1,500 for an individual retiree, while the maximum out-of-pocket costs under Medicare Part D is now $2,100.[12] (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 3.) Therefore, as DBM explains, "in 2026, the largest possible difference in out-of-pocket costs for an individual above the maximum established for the Maryland plan would be $600," but the "HRA provided up to $750 of reimbursement for each individual retiree." (ECF No. 17-1 at 9-10 (citing (Compl. ¶¶ 45, 46)); (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 3). "In other words, the deposit to every retiree in the HRA exceeds the difference between the State maximum and the Medicare maximum." (ECF No. 17-1 at 10). Additionally, the annual deposit method provides more flexibility to retirees because it may cover costs incurred before the retiree reaches the state plan's out-of-pocket maximum. *Id.*; (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 3).

---

[12] *See How much does Medicare drug coverage cost?*, Medicare.gov, https://perma.cc/6KG9-N589 .

Regarding the Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program, DBM does not explain how the health reimbursement account satisfies the functions described in Section 2-509.1, but indicates that claims may be made under this program. (ECF No. 17-1); *see also* (ECF No. 17-1, Ex. 1, Kuminski, Decl. ¶ 7 ("no claims have been submitted for reimbursement under the Life-Sustaining Program by enrollees [in the other Replacement Programs]")). As to the Maryland State Retiree Catastrophic Prescription Drug Assistance Program, DBM identifies changes to Medicare coverage and Director Kuminski's declaration that individual retirees no longer incur any out-of-pocket costs in the catastrophic coverage phase due to Medicare's revised caps on out-of-pocket spending, so there is nothing to reimburse. *See supra* at 8; (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 4).

Plaintiff does not provide any facts or other authorities in response to DBM's rebuttals. *See* (ECF Nos. 18, 24, 25). Instead, Plaintiff repeats, without acknowledging the developments and evidence cited by DBM, Plaintiff's contention that eliminating the Catastrophic Program unlawfully repeals the statutory program. (ECF No. 18 at 20). In response to the DBM's explanation of the HRA annual deposit, Plaintiff seemingly disputes DBM's deposit calculations, contending somewhat vaguely that "retirees with costs above the maximum receive less than full reimbursement." (ECF No. 18 at 21); *see also* (ECF Nos. 24, 25 (not addressing DBM's rebuttals as to these points)). At this stage, Plaintiff bears the burden to prove that he is likely to succeed on the merits. *Winter*, 555 U.S. at 20. This Court is thus far unpersuaded that the arguments and evidence proffered by Plaintiff can defeat the evidence advanced by DBM regarding whether its reimbursement policies comply with Section 2-509.1.

**B. Plaintiff's equal protection claims are unlikely to succeed.**

Plaintiff contends that DBM violates the Equal Protection Clause of the Fourteenth Amendment and associated protections under Article 24 of the Maryland Declaration of Rights[13] by creating "subclassifications within the legislatively defined class of protected retirees that have no statutory authorization and no rational basis." (ECF No. 14-1 at 7).

Specifically, Plaintiff alleges that DBM's implementation "creates two unauthorized subclassifications within th[e] legislatively unified class: (1) a vendor-enrollment subclassification, and (2) an HRA-funding subclassification" which treats retirees differently under the Drug Coverage Program (§ 2-509.1(d)(2)) versus the Catastrophic Program (§ 2-509.1(e)(2)). (ECF No. 14-1 at 7, 9, 11-13). As to the first subclassification, Plaintiff contends that DBM violates the Equal Protection Clause by imposing an enrollment requirement which effectively creates a class of retirees that follows this requirement (and thereby accesses benefits) and another class that does not. (ECF No. 14-1 at 11-12). As to the second subclassification, Plaintiff contends that DBM creates a class of retirees who receive HRA funding under Section 2-509.1(d) and deprives retirees of funding under Section 2-509.1(e) "based solely on DBM's administrative choices." (ECF No. 14-1 at 13-14). Plaintiff contends that both subclassifications fail rational basis scrutiny because the subclassifications are not authorized by Section 2-509.1. (ECF No. 14-1 at 13-14).

---

[13] As Judge Chasanow of this Court has explained, "Article 24 [of the Maryland Declaration of Rights] is Maryland's counterpart to both the due process and equal protection clauses of the Fourteenth Amendment . . . . As a result, Article 24 is read *in pari materia* with the Fourteenth Amendment, and Supreme Court precedent is considered highly persuasive." *Holland v. Prince George's County Md.*, DKC-09-2737, 2011 WL 530559, at *6 (D. Md. Feb. 8, 2011) (citations omitted).

The Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As Judge Bredar of this Court explained: "The Clause does not forbid most forms of unequal treatment, because '[l]awmaking by its nature requires that legislatures classify, and classifications by their nature advantage some and disadvantage others.'" *Applegate, LP v. City of Frederick, Maryland*, 179 F. Supp. 3d 522, 531 (D. Md. 2016) (quoting *Helton v. Hunt*, 330 F.3d 242, 245 (4th Cir. 2003)). Instead, "the Clause forbids only truly arbitrary distinctions among groups that are similar in 'all respects relevant to attaining the legitimate objectives of legislation.'" *Id.* at 531 (quoting *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007)). Conduct implicating a suspect or quasi-suspect classification, such as those based on race or gender, warrant heightened scrutiny, while a classification that does not implicate fundamental rights or suspect classes is subject to rational basis review. *Id.* at 532 (citing *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319-20 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)); *Dandridge v. Williams*, 397 U.S. 471, 487 (1970) (upholding state administrative regulation regarding distribution of public welfare funds which was "rationally based and free from invidious discrimination"). Here, Plaintiff conceded at the hearing on October 28, 2026, that the challenged classifications of retirees are subject to rational basis scrutiny.

Classifications, such as these, which do not implicate a fundamental right or suspect class, are accorded a "strong presumption of validity." *Heller*, 509 U.S. at 319-20. "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (citation omitted). Under this standard, "the plaintiff bears the burden 'to negate every conceivable

basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The State "has no obligation to produce evidence to support the rationality of the statute, which 'may be based on rational speculation unsupported by any evidence or empirical data.'" *Id.* at 303 (quoting *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993)). "[A] State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 303 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

At this stage, Plaintiff has not satisfied his burden to rebut "every conceivable basis" for the classifications. *Giarratano*, 521 F.3d at 303. Plaintiff has not even rebutted the legitimate bases DBM proffered in support of DBM's vendor enrollment requirement or the differences in the implementation of the Replacement Programs. DBM's Opposition contends that the vendor enrollment requirement supports the "efficient administration" of the Replacement Programs; supports the "staffing and expertise" required to administer the Replacement Programs; and allows DBM to "efficiently track enrollment and eligibility." (ECF No. 17-1 at 16). DBM correctly notes that courts have recognized "administrability, efficiency, and reducing burden" as legitimate government interests. (ECF No. 17-1 at 16); *Armour v. City of Indianapolis*, 566 U.S. 673, 683-86 (2012) (holding that a classification that reduces "administrative burden," "administrative costs," and "administrative considerations" satisfied rational basis). In response, Plaintiff has only reiterated that the classifications are "arbitrary,

unauthorized, and irrational" and otherwise fails to address DBM's justifications. (ECF No. 18 at 18); *see also* (ECF No. 14-1 at 7, 9, 11-13; ECF No. 18 at 17-22, 27; ECF No. 24 at 3-4).

Likewise, DBM has explained that it funds and implements the health reimbursement accounts for the Drug Coverage Program (§ 2-509.1(d)(2)) but does not do so for the Catastrophic Program (§ 2-509.1(e)(2)) because retirees no longer incur any costs in the catastrophic coverage phase, meaning there is nothing for the State to reimburse. (ECF No. 17-1 at 7-8, 12); (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 3-4). As noted above, Plaintiff has not rebutted DBM's defenses; Plaintiff merely repeats that DBM's implementation is "[u]nauthorized" and "without Legislative approval." (ECF No. 18 at 20). In sum, Plaintiff, as the one attacking the regulation "ha[s] the burden of showing that the circumstances are otherwise, *i.e.,* that [DBM's] administrative burden is too insubstantial to justify the classification," or that DBM's decision to not implement the Catastrophic Program is unfounded. *See Armour*, 566 U.S. at 686. Plaintiff has not done so and cannot demonstrate a likelihood of success on the equal protection claims.

**C. Plaintiff's due process claims are unlikely to succeed.**

Plaintiff contends that "State-created entitlements are protected property interests under federal law" and that "[c]oerced surrender of protected health information is likewise a constitutionally cognizable injury." (ECF No. 18 at 22 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016))). Plaintiff asserts procedural due process violations from the deprivation of the prescription drug benefits, by virtue of DBM's vendor enrollment and opt-in conditions, without notice or the opportunity

to be heard. (ECF No. 18 at 25); (ECF No. 14-1 at 6, 15-17). Plaintiff also asserts a substantive due process claim in response to DBM's opposition, suggesting that DBM's implementation amounts to "arbitrary governmental deprivation." (ECF No. 18 at 25, 27-28).

In response, and as a threshold matter, DBM claims that the Court should decline to resolve Plaintiff's Due Process Clause claim because it "necessarily requires this Court to resolve underlying questions of Maryland law." (ECF No. 17-1 at 19 (citing *Mora v. City of Gaithersburg*, 519 F.3d 216, 229 (4th Cir. 2008))). *Mora* is distinguishable in important respects. In *Mora*, the Fourth Circuit declined to address whether Maryland's statute governing the application to possess a firearm would have preempted a local Gaithersburg application for the return of firearms; and if the plaintiff, who suffered from a mental illness and posed a safety threat, would be permitted to possess a firearm under Maryland state law, which required review of his application by a state agency. *Mora*, 519 F.3d at 229. In that case, the Fourth Circuit found it "unthinkable" to issue an injunction for the return of plaintiff's firearms on due process grounds without knowing whether the state agency charged with reviewing and verifying his responses to the state questionnaire would find that plaintiff is entitled to possess a firearm under Maryland law. *Mora*, 519 F.3d at 229-30. By contrast, there is no conflict between Maryland state and local laws to resolve here. Further, whether a retiree is eligible for benefits under the Replacement Programs is set forth in the statute based on dates of retirement, *see* Md. Code Ann, State Pers. & Pens. § 2-509.1(d)(1), (e)(1), (f)(1); it does not turn on a pending review before a state agency. Therefore, the state law questions are not so complex and unresolved as in *Mora*.

Indeed, federal courts routinely resolve due process challenges under the Fourteenth Amendment that allege entitlements which turn upon interpretations of state law. *See, e.g.*, *Board of Regents v. Roth*, 408 U.S. 564, 578 (1972) (rejecting professor's procedural due process claim upon finding that no "state statute or [Wisconsin State] University rule or policy" secured his claim to re-employment); *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 370 (4th Cir. 2008) ("We look to state law to determine whether the Clinic had a cognizable property interest that could trigger federal due process guarantees."); *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, 124 F. Supp. 3d 586, 594 (D. Md. 2015) ("Property interests under the Fourteenth Amendment 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" (citation omitted)). Therefore, the Court will consider Plaintiff's Due Process claims.[14]

Plaintiff has not demonstrated a likelihood of success on his procedural due process claims. The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In a procedural due process claim, a plaintiff must: (1) "demonstrate that he had a constitutionally cognizable life, liberty, or property interest," (2) "show that the deprivation of that interest was caused by 'some form of state action,'"; and (3) "prove 'that the procedures employed were constitutionally inadequate.'" *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (citation omitted).

[14] The Court's ruling at this preliminary stage does not address DBM's defenses under the Eleventh Amendment, including that Plaintiff's claims are barred by sovereign immunity. (ECF No. 17-1 at 21-22).

Plaintiff has likely identified a cognizable property interest in the prescription drug benefits under Section 2-509.1 because the statute uses mandatory language that the Replacement Programs "shall" be established to "reimburse[] [a statutorily defined class of retirees and dependents] for [certain] out-of-pocket costs." Md. Code Ann, State Pers. & Pens. § 2-509.1(d)(2), (e)(2), (f)(2); (ECF No. 14-1 at 15); *Mallette v. Arlington County Employees' Retirement System II*, 91 F.3d 630, 632, 635-36 (4th Cir. 1996) (finding ordinance endowed plaintiff with protected property interest in application for retirement benefits). Moreover, DBM's contention that Plaintiff fails to identify a protectable property interest in the benefits because DBM has not identified an entitlement under Maryland common law is not an accurate statement of due process jurisprudence, which broadly considers whether existing rules, statutes, or the common law confer a property interest. *Board of Regents v. Roth*, 408 U.S. 564, 578 (1972); *c.f. Menk v. MITRE Corp.*, 713 F. Supp. 3d 113, 176-77 (D. Md. 2024) (recognizing property interests "are defined by existing rules or understandings that stem from an independent source such as state law" (quoting *Roth*, 408 U.S. at 578).

However, Plaintiff has not demonstrated that DBM's enrollment conditions and use of a third party to administer the program deprive him of procedural due process. Section 2-509.1(i) permits DBM to procure a "third party to administer health reimbursement accounts" for Replacement Programs, and DBM has done just that. *See* (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 8-10). Since this statutory provision applies generally to the Replacement Programs for the defined retirees, the "the political process provides all the process that is due." *Clayland Farm Enterprises, LLC v. Talbot County, Maryland*, GLR-14-3412, 2019 WL 4116631, at *12 (D. Md. Aug. 29, 2019) (citation omitted), *aff'd*, 987 F.3d 346 (4th Cir. 2021). Unlike adjudicative

acts affecting specific individuals, a party generally is not entitled to an opportunity to be heard when a legislature passes a law which affects a general class of persons. *Id.* (citing, *inter alia*, *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991)). Likewise, a legislative-type policy decision regarding the enforcement of a state statute, such as DBM's procurement of the vendor or DBM's decision not to implement the Catastrophic Program, generally does not entitle an affected individual to further procedural safeguards. *Hoffman v. City of Warwick*, 909 F.2d 608, 620-21 (1st Cir. 1990) (explaining uniform policy decision not to enforce statute that provided seniority benefits "was a legislative-type decision for which no individual hearing was necessary" despite the failure to follow proper state procedures to repeal the statute before ceasing to provide the entitlement).

Plaintiff also has not demonstrated that the enrollment conditions were unconstitutional or that he, as a member of the statutory class of eligible retirees, was due more procedural safeguards than the DBM public notice or letters notifying eligible retirees how to access benefits. (ECF No. 14-1 at 15-17). "[T]he requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" according to the factors established by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), including the following:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (first quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), then quoting *Mathews v. Eldridge*, 424 U.S. 319 (1976)). In a conclusory fashion,

Plaintiff claims that his inability to access the benefits under the Replacement Programs satisfies each of the *Mathews* factors above and warrants additional procedural safeguards. (ECF No. 14-1 at 16-17).[15] At this stage, Plaintiff's assertions are insufficient to demonstrate a likelihood of success on these procedural due process claims.

Likewise, Plaintiff has not demonstrated a likelihood of success on his substantive due process claims. As for a substantive due process claim based on deprivation of a property interest, plaintiff must demonstrate the action is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *A Helping Hand, LLC*, 515 F.3d at 372 (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)); *Mora*, 519 F.3d at 230 (stating regulation violates substantive due process when it is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies"). As discussed *supra* in Sections I.A-B, DBM states that the third-party administration supports the efficient and cost-effective implementation of a large-scale program, (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 8-10); and the vendor enrollment conditions likewise support enrollment tracking and administrative efficiency. (ECF No. 17-1 at 8-9, 16). Accordingly, Plaintiff is unlikely to succeed on the merits of his substantive due process claim because the efficient administration of the prescription benefit programs supports legitimate government interests in the public health and welfare.

---

[15] Plaintiff also makes passing references to violations of Article 19 of the Maryland Declaration of Rights, *see, e.g.*, (ECF No. 14-1 at 1, 18), but does not develop these arguments. Accordingly, the Court also finds that Plaintiff has failed to carry his burden to demonstrate a likelihood of success as to any claims under Article 19.

In sum, the Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits.

## II. Irreparable Harm

Since Plaintiff is required to satisfy all four *Winter* factors, success on the last three factors would not entitle Plaintiff to a preliminary injunction here. *See, e.g.*, *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). However, this Court proceeds in its analysis of the three remaining factors.

Plaintiff has the burden of showing "that in the absence of a preliminary injunction," Plaintiff is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted). Plaintiff must make a "clear showing of irreparable harm," which "must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (citation omitted). Plaintiff contends that he will be irreparably harmed from (1) his inability to access the benefits from the Replacement Programs which will result in unrecoverable costs incurred from purchasing prescription drugs; (2) the related deprivation of necessary medications, such as insulin; and (3) the unauthorized disclosure of Plaintiff's protected health information to the third-party vendor.[16] (ECF No. 14-1 at 18-20).

[16] Plaintiff also contends that the "[c]onstitutional [v]iolations [a]re [p]er [s]e [i]rreparable," but since that harm is premised on finding a likelihood of success on the constitutional claims, the Court does not address it further. (ECF No. 14-1 at 18).

As to the first claim of irreparable harm, Plaintiff is correct that economic costs which are barred by sovereign immunity may constitute irreparable harm. (ECF No. 14-1 at 18-19[17]). However, a finding that unrecoverable economic harm is irreparable has "typically been reserved for circumstances where the economic loss was severe or threatened an entity's solvency." *Firehouse v. United States Dep't Defense*, 2:25-CV-00041, 2025 WL 2496205, at *1 (E.D.N.C. Aug. 29, 2025) (finding *pro se* plaintiff claiming irreparable harm from unrecoverable out-of-pocket healthcare costs had not demonstrated irreparable harm to warrant injunctive relief); *cf. Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500-01 (D. Md. 2020) (finding irreparable harm where plaintiff showed rule would reduce Medicare drug expenditures by nearly $5 billion and be unrecoverable economic harm). Plaintiff has not identified the amounts that Plaintiff is forced to expend without reimbursement, and Plaintiff has not established that these amounts are sufficiently severe to support his request for injunctive relief. (ECF No. 14-1 at 18-19).

As to the second claim of irreparable harm, Plaintiff claims that his inability to access Replacement Program benefits "increase[s] the risk of interruptions in access to necessary medications," such as insulin. (ECF No. 14-1 at 19 (citing *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013)). Although the loss of "needed medical care" can qualify as irreparable harm, *Pashby*, 709 F.3d at 329, the only medication Plaintiff has identified is insulin, and DBM has submitted evidence that insulin is not eligible for reimbursement under the Life-Sustaining Program. (ECF No. 17-1 at 28 n.12 (citing *Life-Sustaining Prescription Drug Assistance Program:*

---

[17] Curiously, the case cited by Plaintiff in support of this argument, *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958), does not stand for this proposition regarding economic harm barred by sovereign immunity.

*2026 Medicare "Protected Classes" Drug List*, Maryland.gov, available at https://perma.cc/6EGY-E4VA)); (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶5 (citing the same list and explaining that it "does not include insulin")). Therefore, even if Plaintiff accessed the Replacement Program benefits, he would not be entitled to reimbursement for insulin out-of-pocket costs. Plaintiff has not come forward with any evidence or authorities to rebut this. *See generally* (ECF No. 24). Plaintiff has not made a "clear showing" that he will suffer an interruption to necessary medications. *Scotts Co.*, 315 F.3d at 283.

As to Plaintiff's third claim of irreparable harm, Plaintiff contends that the unauthorized disclosure of their protected health information to Via Benefits constitutes irreparable harm. (ECF No. 14-1 at 19-20[18]). However, "speculation about the potential disclosure of privileged, confidential, or protected information is insufficient to demonstrate irreparable harm." *See, e.g.*, *MaineGeneral Medical Ctr. v. Engels*, No. 25-5297, 2025 WL 2682148, at *1 (D.C. Cir. Sep. 17, 2025) (per curiam); *Adaptive Hospice, LLC v. Bristol Hospice – Indiana, LLC*, No. 4:26-cv-00061-TWP-KMB, 2026 WL 3181103, at *7-9 (S.D. Ind. Oct. 23, 2026) (finding plaintiff failed to show irreparable harm from alleged disclosure of patient information where plaintiff had not identified violation of confidentiality obligation and had shown only the "mere possibility" that defendants may obtain or misuse the information). Plaintiff has not supported these contentions with any authorities or facts that a violation of a confidentiality

[18] This case referenced by Plaintiff for this argument also does not support the proposition for which it is cited. *Doe v. Public Citizen*, 749 F.3d 246, 272 (4th Cir. 2014) does not concern injunctive relief, irreparable harm, or protected health information. *Public Citizen* is a case concerning the sealing of company records filed in litigation concerning the death of an infant related to a company's products. *Public Citizen*, 749 F.3d at 252.

obligation has occurred or is imminent or that Via Benefits even accesses his protected health information.[19] *See* (ECF No. 14-1 at 19-20; ECF No. 24 at 4). Meanwhile, DBM has come forward explaining that DBM's partnership with Extend Health, LLC, which operates Via Benefits, is subject to a "Business Associate Agreement that contains the appropriate confidentiality and privacy safeguards for protected health information as required by the Health Insurance Portability and Accountability Act ('HIPAA') as well as other federal and state laws." (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 15). Plaintiff's claim of irreparable harm from the disclosure of health information is speculative, as Plaintiff has only demonstrated a mere possibility that Extend Health, LLC and Via Benefits have obtained or will misuse his protected health information.

Plaintiff's various claims of irreparable harm are therefore insufficient to warrant the extraordinary relief of a preliminary injunction.

## III. Balance of the Equities and Public Interest

Balance of the equities and public interest factors merge when the government opposes a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As Defendant correctly observes, courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter*, 555 U.S. at 24, especially since the decision whether to grant a preliminary injunction is made on an incomplete record, and "'the danger

[19] DBM has attested that Extend Health, LLC and Via Benefits have DBM's "eligibility determinations," (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶ 11), but Plaintiff has not shown that this would qualify as "protected health information" or that Extend Health, LLC or Via Benefits maintains any other information concerning Plaintiff.

of a mistake' in this setting 'is substantial.'" *Person v. City of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) (citation omitted).

Here, Plaintiff contends that the balance of the equities is in his favor because he faces "ongoing statutory, financial, and medical harms that cannot be remedied after the fact, while DBM faces only the administrative burden of complying with the statute." (ECF No. 14-1 at 20, 22). These arguments, however, are premised upon Plaintiff's irreparable harm and likelihood of success, which the Court has already found insufficient to support injunctive relief.

Moreover, Plaintiff's requested relief would not maintain the status quo while this action is pending;[20] it would upend it. Plaintiff's requested injunction would require DBM to reverse course on its vendor-assisted administration of the Replacement Programs, which has been in place for over a year (and announced more than two years ago). Plaintiff asks this Court to enjoin DBM to expend tax-payer dollars to acquire the technology and expertise to directly administer the large-scale Replacement Programs. (Proposed Order, ECF No. 14-15 at 1-2). The Director of DBM's Employee Benefits Division, Christina Kuminski, attests that "if the Department were forced to administer this program internally without the assistance of a third-party vendor, the Department would face higher costs and have a lower level of expertise compared to Extend Health or another third-party vendor." (ECF No. 17-1, Kuminski Decl. ¶ 17). Director Kuminski estimates that administering the HRAs directly by DBM would cost the State over $3 million to hire 30 new full-time employees, which would

[20] 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2947 (3d ed. 2026).

not include the additional costs that would be required for seasonal agents for enrollment periods, and the costs associated with recruiting, training and licensing the new employees. (ECF No. 17-1, Ex. 1, Kuminski Decl. ¶¶ 18-19). On the other side of the ledger, DBM contends that Plaintiff has lost the opportunity to recover approximately $750 in annual prescription drug reimbursements under the Replacement Programs. (ECF No. 17-1 at 29, n.13). Plaintiff has not shown that the balance of equities tips in his favor or that such far-reaching public consequences are justified.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Temporary Restraining Order (ECF No. 20) is DENIED AS MOOT, and Plaintiff's Motion for Preliminary Injunctive Relief (ECF No. 14) is DENIED.

A separate Order follows.

Date: November 6, 2026

/s/
Richard D. Bennett
United States Senior District Judge